**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701,

SIERRA CLUB,
2191 Webster St., Suite 1300
Oakland, CA 94612-3011,

FRIENDS OF THE EARTH U.S.,
1101 15th Street NW, 11th Floor
Washington, DC 20005,

WATERKEEPER ALLIANCE, INC.,
180 Maiden Lane, Suite 902
New York, NY 10038,

MONTANA ENVIRONMENTAL
INFORMATION CENTER,
P.O. Box 1184
Helena, MT 59624,

       Plaintiffs,

    v.

U.S. ARMY CORPS OF ENGINEERS,
441 G Street NW
Washington, DC 20314-1000,

LIEUTENANT GENERAL WILLIAM H.
GRAHAM, JR., in his official capacity as
Chief of the U.S. Army Corps of Engineers,
441 G Street NW
Washington, DC 20314-1000,

       Defendant.

Civil Action No.:  1:26-cv-2571

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

**<u>INTRODUCTION</u>**

1.     This case involves the U.S. Army Corps of Engineers' ("Corps") reissuance of

Nationwide Permit 12 ("NWP 12"), a general permit for oil and gas pipeline projects pursuant to

Section 404(e) of the Clean Water Act ("CWA"). The Corps violated the Endangered Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), the CWA, and the Administrative Procedure Act ("APA") by issuing NWP 12 without adequately assessing its significant, direct, indirect, and cumulative environmental effects.

2.      NWP 12 is a final permit authorizing a streamlined process for oil and gas pipelines to be built across rivers, streams, and wetlands, often with no further Corps involvement whatsoever. Projects using NWP 12 may proceed without undergoing the comprehensive environmental review ordinarily required by Section 404(a) of the CWA, and there is no public notice or opportunity for public involvement when projects are approved under NWP 12. The Corps estimates that NWP 12 will be used 3,700 times per year, or an expected 18,500 times during its five-year duration, resulting in direct impacts to approximately 1,500 acres of waters of the United States. 2026 NWP 12 Decision Document at 108.[1]

3.      The Corps reissues the NWPs with relatively minor modifications about every five years. The 2026 NWP 12 replaces the 2021 iteration of NWP 12, which replaced the 2017 iteration of the permit. The 2026 NWP 12 is substantially the same as the 2021 NWP 12.

4.      In previous litigation over the 2017 NWP 12, the U.S. District Court for the District of Montana ruled that the Corps violated the ESA by failing to undertake programmatic consultation pursuant to Section 7 of the ESA with the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (together, the "Services") to consider the cumulative adverse environmental effects of discharges on protected species and their critical

---

[1] The Corps' Decision Document for NWP 12 provides the public interest review required by Corps regulations at 33 CFR 320.4(a), as well as the Corps' environmental assessment of NWP 12 pursuant to NEPA. *See* U.S. Army Corps of Engineers, Decision Document Nationwide Permit 12 (Jan. 8, 2026), available at https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll9/id/3161.

habitats. *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 454 F. Supp. 3d 985, 994 (D. Mont. 2020). The court declared NWP 12 unlawful and remanded it to the Corps for compliance with the ESA. The court declined to rule on claims brought under the NEPA and the CWA, stating that the Court "anticipates that the ESA Section 7(a)(2) consultation will inform" the Corps' NEPA and CWA assessments of NWP 12's environmental effects. *Id.* at 994–96.

5.      Despite this ruling, the Corps refused to initiate ESA Section 7 programmatic consultation on the 2017 NWP 12. Instead, it reissued a new version of NWP 12 on January 13, 2021, one week before the end of the first Trump administration and well before the scheduled expiration of the 2017–2022 NWPs. The Corps, flouting the Montana District Court's ruling on the 2017 NWP 12, again determined that the issuance of the 2021 NWP 12 would have "no effect" on listed species based on the same reasoning rejected by the Montana court.

6.      On May 3, 2021, Plaintiffs in the instant case again challenged the Corps' reissuance of NWP 12 in the U.S. District Court of Montana. *Ctr. for Biological Diversity v. Spellmon*, No. 4:21-cv-00047 (D. Mont. filed May 3, 2021). On August 18, 2022, the case was transferred to the U.S. District Court for the District of Columbia and was assigned Case Number 1:22-cv-02586.

7.      On January 8, 2026, the Corps reissued a new set of nationwide permits, including NWP 12, which became effective on March 15, 2026. Because the issuance of the 2026 iteration of NWP 12 mooted Plaintiffs' claims regarding the 2021 NWP 12, the parties stipulated to voluntary dismissal on April 23, 2026.

8.      In reissuing NWP 12 in 2026, the Corps once again disregarded its legal obligation to complete programmatic ESA Section 7 consultation with the Services by concluding that the issuance or reissuance of the permit would have "no effect" on listed species.

In doing so, the Corps once again relied on the same erroneous reasoning previously rejected by the Montana District Court, contending that programmatic consultation is not required because all NWP 12 projects that "may affect" listed species are subject to project-specific consultation and therefore the issuance of NWP 12 has "no effect" on listed species. *N. Plains*, 454 F. Supp. 3d at 991–92.

9.      As before, the Corps' "no effect" determination is inconsistent with applicable regulations, which require consultation at *both* the programmatic and project-specific stages for NWP 12. *See* 50 C.F.R. § 402.14(c)(4) (project-specific consultation "does not relieve the Federal agency of the requirements for considering the effects of the action as a whole"); 84 Fed. Reg. 44976, 44997 (Aug. 27, 2019) (confirming the ESA requires programmatic consultation even if specific projects developed in the future are subject to site-specific consultation); *see also N. Plains*, 454 F. Supp. 3d at 992 ("The Corps cannot circumvent ESA Section 7(a)(2) consultation requirements by relying on project-level review or General Condition 18 . . . . Project-level review does not relieve the Corps of its duty to consult on the issuance of nationwide permits at the programmatic level. The Corps must consider the effect of the entire agency action.").

10.     The Corps' repeated failure to consult with the Services when issuing and/or reissuing NWP 12 is therefore an egregious violation of one of the most vital safeguards of the ESA. Indeed, the Corps is "well aware" that the reauthorization of NWP 12 requires such consultation; there is "resounding evidence" that the reissuance of NWP 12 "may affect" listed species; and programmatic review "provides the only way to avoid piecemeal destruction of species and habitat." *N. Plains*, 454 F. Supp. 3d at 990–94.

11.    NWP 12 also continues to violate the CWA. Section 404(e) of the CWA allows the Corps to issue nationwide permits only for activities that will have "minimal adverse environmental effects" and will cause only "minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). NWP 12, however, authorizes activities that *will* cause far more than minimal adverse environmental effects, both individually and cumulatively.

12.    The Corps allows oil and gas pipelines to use NWP 12 repeatedly for each water crossing along a project's length, with no limit to the number of times a pipeline can use NWP 12 or the total number of acres of wetlands that a project can impact. NWP 12 thereby allows the Corps to artificially treat large interstate pipeline projects as hundreds or even thousands of separate "single and complete projects" to apply the general permit and thereby avoid the more transparent and thorough individual permit process required by Section 404 of the CWA, which includes public notice and comment and an analysis of the project's overall impacts and alternatives pursuant to NEPA and the CWA. This use of NWP 12 causes more than minimal direct and cumulative adverse environmental effects in violation of Section 404(e) of the CWA.

13.    The Corps' inadequate environmental analysis for NWP 12 also violates NEPA. The Corps does not prepare any project-level NEPA analysis for NWP 12 activities because the Corps purports to have discharged its NEPA obligations upon issuance of an environmental assessment and finding of no significant impact for NWP 12 as a whole (the "NWP 12 EA," which is set forth in the NWP 12 Decision Document). *See* NWP 12 Decision Document at 9–15, 44, 133. The NWP 12 EA therefore constitutes the Corps' only NEPA analysis for the expected 18,500 times NWP 12 will be used to permit pipeline projects during its five-year duration.

14.    The Corps' NWP 12 EA violates NEPA by failing to adequately evaluate the environmental impacts of pipeline projects permitted by NWP 12. The NWP 12 EA fails to

adequately analyze the direct, indirect, and cumulative impacts associated with the construction and operation of oil and gas pipelines under NWP 12, such as the effects of numerous water crossings, impacts from the creation of pipeline rights-of-way (including the removal of high-quality forested wetlands), or the impacts of frac-outs during pipeline construction. And the NWP 12 EA does not evaluate the specific risks or impacts of oil spills into waterways from pipelines at all. The Corps has therefore failed to take the "hard look" at the environmental impacts of NWP 12 activities, as NEPA requires.

15.     In limiting its analysis of the environmental impacts of NWP 12 by ignoring indirect and/or cumulative impacts—including the cumulative impacts of thousands of NWP 12 activities per year and spills from NWP 12-authorized oil and gas pipeline projects—the Corps violates the plain language of NEPA. *See* 42 U.S.C. § 4332(2)(C)(ii) (requiring an evaluation of "*any* reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented," "*to the fullest extent possible*") (emphasis added).

16.     Plaintiffs therefore seek a declaration that the Corps' issuance of NWP 12 violated the ESA, NEPA, CWA, and APA, as well as an order vacating the permit.

## JURISDICTION AND VENUE

17.     This case arises under the ESA, 16 U.S.C. §§ 1531–1544; the CWA, 33 U.S.C. §§ 1251–1389, including § 1344(b) (application of Corps guidelines in permit determinations), § 1344(c) (prohibition of discharge of dredged or fill material that will have an unacceptable adverse effect), and § 1344(e) (setting forth circumstances in which the Corps can issue nationwide permits); NEPA, 42 U.S.C. §§ 4321–4370m; and the APA, 5 U.S.C. §§ 701–706.

18.     This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 (review of agency action under the APA); 16 U.S.C. §§ 1540(c), (g) (actions arising under the ESA citizen

suit provision); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. §§ 2201–02 ("creation of remedy" and "further relief" provisions establishing power to issue declaratory judgments in cases of actual controversy). The Court may grant the relief requested under the ESA, 16 U.S.C. § 1540(g), the APA, 5 U.S.C. §§ 701-706, and 28 U.S.C. § 2201–02 (declaratory and injunctive relief).

19.    Venue is appropriate in this Court under 28 U.S.C. § 1391(e)(1) because Defendant U.S. Army Corps of Engineers is headquartered in Washington, D.C.

## PARTIES

### Plaintiffs

20.    Plaintiff Center for Biological Diversity ("Center") is a national nonprofit organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 101,000 members and more than 1.8 million online supporters worldwide. The Center has worked for decades to safeguard water and aquatic habitats for people, plants, and animals. One of the Center's main goals is to protect the habitats and communities that may be adversely affected by fossil fuel infrastructure projects, such as oil and gas pipelines that utilize NWP 12. The Center's members and staff value and benefit from rare species' continued existence in the wild and are harmed by industrial development and associated water degradation that threatens wild species' survival and recovery. The Center has worked for years to protect imperiled species that will be harmed by NWP 12 projects, including migratory birds that rely on waterways and imperiled fish and other aquatic animals that reside within and rely on rivers, streams, and wetlands crossed by NWP 12 projects.

21.    Plaintiff Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. The Sierra Club has over 590,000 members

7

dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. The Sierra Club has chapters and members in every state. The Sierra Club's concerns encompass the protection of wildlands, wildlife and habitat, water resources, air, climate, public health, and the health of its members, all of which stand to be affected by NWP 12.

22.     Plaintiff Friends of the Earth U.S. ("FoE") is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation. It has offices in Oakland, California, and Washington, D.C., where it is incorporated. FoE is a membership organization consisting of over 150,000 members across all 50 states. Additionally, FoE has more than 4.8 million activist supporters on its email list throughout the United States. It is also a member of Friends of the Earth International, which is a network of grassroots groups in more than 70 countries worldwide. Its mission is to protect our natural environment, including air, water, and land, to achieve a healthier and more just world, using public education, advocacy, legislative processes, and litigation. FoE is concerned about the adverse environmental and socio-economic impacts that fossil fuel development and climate change have, including harms to air quality, climate, imperiled species, the health of local communities, and precious groundwater resources. Therefore, on behalf of its members and activists, FoE's Climate, Energy & Oceans Program actively engages in advocacy to curb new oil and gas leases as well as influence policy and law governing fossil fuel development. Ending destructive pipeline development is one of FoE's priorities.

23.     Plaintiff Waterkeeper Alliance, Inc. ("Waterkeeper") is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation organized under the laws of, and headquartered in,

New York. Waterkeeper is a member-supported, international environmental advocacy organization whose mission is to connect, support, and advocate with Waterkeeper groups to protect the right to clean water with communities worldwide. Composed of approximately 300 member and affiliate organizations around the world, including more than 150 such organizations across the United States, and more than 21,000 individual supporting members, Waterkeeper's goal is drinkable, swimmable, and fishable water everywhere. Under its Clean Water Defense campaign, Waterkeeper opposes weakening of environmental laws, regulations, and permits, while promoting stronger legal safeguards for the world's water resources. Waterkeeper holds polluters accountable and advocates for vigilant enforcement of environmental laws.

24.    Plaintiff Montana Environmental Information Center ("MEIC") is a nonprofit organization founded in 1973 with approximately 5,000 members and supporters throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the human environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations. MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution. MEIC and its members have intensive, long-standing recreational, aesthetic, scientific, professional, and spiritual interests in the responsible production and use of energy, the reduction of greenhouse gas pollution as a means to ameliorate the climate crisis, and the land, air, water, wildlife, and communities impacted by the development of fossil fuels and related infrastructure, including oil

and gas pipelines. MEIC members live, work, and recreate in areas, including rivers, streams, and wetlands, that will be adversely impacted by the construction and operation of oil and gas pipelines authorized by NWP 12.

25.     In bringing this lawsuit, Plaintiffs stand in the shoes of members who live, work, and recreate in places threatened by NWP 12 and who use, study, and cherish the land, water, wildlife, and other resources that will be irrevocably damaged by NWP 12-authorized activities. Plaintiffs have numerous members who live and recreate in areas directly affected by NWP 12 activities, and Plaintiffs' members and staff include individuals who study and advocate for better protection of wildlife and other resources threatened by NWP 12-authorized activities.

26.     NWP 12 has been and will continue to be used across the country to permit the construction of oil and gas pipelines through rivers, streams, and wetlands, causing construction-related harm through sediment deposition and habitat loss and fragmentation, as well as operational harm through leaks and spills that devastate waterways that people and wildlife rely on, including members of the Plaintiff organizations.

27.     Plaintiffs have members throughout the country who rely on waterways that will be crossed by NWP 12 projects for drinking water and/or irrigation. Oil and other contaminant spills from such projects pose significant risks for Plaintiffs' members whose water supplies would be adversely affected by NWP 12 activities.

28.     Plaintiffs also have members whose interests are adversely affected by direct, indirect and cumulative harm from NWP 12-authorized activities to aquatic, riparian, and upland habitat areas that such members use and enjoy, including habitat for ESA-listed wildlife. For example, construction and operation of pipelines permitted under NWP 12 harm protected species that Plaintiffs' members study and enjoy—such as endangered and threatened fish,

10

turtles, freshwater mussels, and migratory birds—through sedimentation of waterways that contaminates habitat and reduce opportunities for feeding and breeding, as well as spills of crude oil and leakage or seepage of pollutants or hydraulic fracture fluids from natural gas pipelines, that can lead to ingestion, oiling of plumage, bioaccumulation of contaminants, and oil transfer to eggs and young, which could in turn result in mortality, reduced reproductive success, deformities, and developmental delays.

29.     The past use of NWP 12 to authorize oil and gas pipeline projects—including major projects such as the Mountain Valley pipeline, the now defunct Atlantic Coast and Keystone XL pipelines, and the Dakota Access pipeline—demonstrates how NWP 12 will be used thousands of times to construct pipelines in waterbodies across the country, resulting in harm to rivers, streams, wetlands, and the wildlife and communities that rely on those waterways, thereby harming the interests of Plaintiffs' members who live near, study, and/or enjoy areas affected by NWP 12.

30.     NWP 12 has been used, and is likely to continue to be used, for oil pipelines intended to move crude from areas such as the Bakken Formation in Montana and North Dakota as well as tar sands oils from Alberta, Canada to refineries and/or export terminals in the U.S. These projects often must cross hundreds of waterways, including rivers that provide public water supply and habitat for listed species. Construction-related habitat degradation and oil spills would devastate critically imperiled species, thereby harming Plaintiffs' members who study them and/or enjoy their existence in the wild. Likewise, massive gas pipeline projects across the U.S. that will use NWP 12 threaten water supplies and listed species and the habitats they rely on, which are also studied, enjoyed, and relied on by Plaintiffs' members.

31.     Because NWP 12 is a final permit authorizing the construction of oil and gas pipelines through U.S. waters, often with no notice to, or further involvement by, the Corps, NWP 12-authorized activities are adversely impacting streams, rivers, and wetlands on which Plaintiffs and their members rely, without any project-specific review process, and without any assessment of how these activities harm waterways, species, and ecosystems, including their cumulative effects.

32.     Plaintiffs are aware of several pipeline projects that, upon information and belief, have been or will imminently be verified by the Corps to use 2026 NWP 12 to construct such pipelines within waters of the United States and which will have significant and far-reaching environmental impacts, including impacts on wildlife—including ESA-listed species and their critical habitats, and water supplies—thereby harming the interests of Plaintiffs and their members. As soon as a pipeline project is verified by the Corps, the proponent may begin construction through and across jurisdictional waters. However, because there is no public notice at any point during the NWP 12 verification process, information on specific pipelines verified and/or authorized by NWP 12 is in the sole possession and control of Defendants, and the Corps does not make that information publicly available.

33.     For example, the proposed South System Expansion 4 Project (the "SSE4 Pipeline") is a natural gas pipeline that, upon information and belief, has been or imminently will be verified by the Corps to use NWP 12 and poses a substantial risk of harm to federally listed endangered and threatened species and their critical habitats along its approximately 291-mile route through Mississippi, Alabama, and Georgia. The SSE4 Pipeline would involve extensive ground disturbance from the construction of multiple pipeline loops, compressor station expansions, and associated facilities. The SSE4 Pipeline would cross approximately 1,342

waterbodies, including major river systems such as the Flint, Oconee, Ogeechee, Alabama, Cahaba, Pascagoula, Chickasawhay, Sucarnoochee, and Tallapoosa Rivers, and Buckatuna and Chewacla Creeks, as well as roughly 400 perennial streams and extensive areas of jurisdictional wetlands. These interconnected aquatic systems provide habitat for numerous federally listed species, including but not limited to the endangered Alabama, Atlantic, and shortnose sturgeons, and the threatened Gulf sturgeon and Pearl darter, along with multiple endangered freshwater mussels such as the southern clubshell, Gulf moccasinshell, ovate clubshell, shinyrayed pocketbook, and oval pigtoe. The scale and geographic scope of these crossings, combined with the project's extensive wetland and stream impacts, create a significant likelihood of habitat degradation and adverse effects to aquatic ecosystems supporting these species.

34.     An additional example of a pipeline that, upon information and belief, has been or imminently will be verified to use NWP 12 is the Mississippi Crossing Pipeline ("MSX Pipeline"), which similarly threatens federally listed species and critical habitat along its approximately 208-mile route across Mississippi and into Alabama. The MSX Pipeline requires construction of a large-diameter pipeline and three compressor stations in Humphreys, Attala, and Lauderdale Counties, Mississippi, resulting in widespread ground disturbance and habitat alteration. The MSX Pipeline would traverse approximately 869 waterbodies, including at least 115 perennial streams and rivers such as the Big Sunflower, Yazoo, Big Black, Pearl and Yockanookany Rivers, and creeks such as Fannegusha, Black, Gourdvine, Box, Long, Conehoma, Lobutcha, Rice, Witt, Tallashua, Okatibbee, Bucatunna, Hurricane, Okatuppa, and Chunky Creeks, as well as hundreds of acres of associated wetlands and riparian corridors that support sensitive species and ecosystems. These habitats are also known to support federally listed species, including but not limited to the threatened Gulf sturgeon and Pearl darter, the

endangered Mississippi redbelly turtle and threatened yellow-blotched sawback/map turtle, and freshwater mussels such as the endangered sheepnose, threatened pyramid pigtoe, and others that are highly vulnerable to sedimentation, reduced water quality, and hydrologic disruption. The construction and operation of the MSX Pipeline will also fragment upland forested habitat and adversely affect terrestrial species, including the endangered Red-cockaded woodpecker and federally protected bat species such as the threatened northern long-eared bat and endangered Indiana bat.

35.    Plaintiffs have members whose concrete interests are directly affected by the SSE4 and MSX Pipelines. For example, Center member Dr. Bernard Kuhajda is an aquatic conservation biologist focused on imperiled aquatic species in the southeastern United States, including sturgeons, darters, freshwater mussels, and aquatic reptiles. Dr. Kuhajda has professional, scientific, personal, moral, and aesthetic interests in the endangered and threatened aquatic species that will be affected by the SSE4 and MSX Pipelines, including the Alabama sturgeon, Atlantic sturgeon, Gulf sturgeon, shortnose sturgeon, and Pearl darter. Dr. Kuhajda studies these species and publishes scientific articles regarding genetics, behaviors, habitats, conservation, and recovery of imperiled and listed freshwater species, and plans to continue to do so into the future as part of his job. Dr. Kuhajda regularly visits the Cahaba River, which will be crossed by the SSE4 Pipeline, to seek out and observe Alabama and Gulf sturgeon. He conducts sampling trips at least approximately every two years, including most recently in November 2025, and plans to lead another trip collecting fishes in the Cahaba River in the summer or fall of 2026, and will continue visiting the Cahaba River system on a recurring basis for research, monitoring, conservation, professional, recreational, aesthetic, and educational purposes, including the opportunity to observe and study these species in their natural habitats. The

14

construction and operation of the SSE4 and MSX Pipelines authorized by NWP 12 without adequate environmental review or safeguards threaten the spawning, feeding, and refugia habitat for sturgeon, Pearl darters, and other aquatic species, thereby harming Dr. Kuhajda's personal, professional, scientific, recreational, aesthetic, and moral interests by increasing the likelihood that the species he studies, works to protect, and seeks to observe in the wild will decline further or be extirpated. Any activities that destroy, degrade, or diminish the waterways that will be crossed by the SSE4 and MSX Pipelines, or that kill, injure, harm, harass, or displace wildlife interfere with Dr. Kuhajda's work and diminish his ability to enjoy freshwater ecosystems and the species therein.

36.     In addition, Center member Tierra Curry has interests in the endangered and threatened aquatic species that will be affected by the SSE4 and MSX Pipelines, including but not limited to freshwater mussels such as the southern clubshell, Gulf moccasinshell, ovate clubshell, shinyrayed pocketbook, oval pigtoe, and pyramid pigtoe. Ms. Curry has devoted her career to observing, studying, protecting, advocating for, and educating the public about the importance of freshwater mussels and the aquatic ecosystems upon which they depend. She regularly studies, observes, and derives professional, scientific, recreational, educational, aesthetic, and spiritual benefit from these species and the rivers and streams they inhabit, and she intends to continue doing so in the future. The authorization, construction, and operation of the SSE4 and MSX Pipelines threaten to degrade and fragment aquatic habitat, increase pollution and sedimentation, alter stream hydrology, and otherwise harm the freshwater mussel species and ecosystems in which Ms. Curry has longstanding interests. These pipelines, which rely on NWP 12, thereby impair Ms. Curry's ability to study, observe, advocate for, and enjoy these species and their habitats and undermine her ongoing conservation, educational, and scientific work.

37.    Another example of a pipeline that, on information and belief, has been or will imminently be verified by the Corps to use NWP 12 is the Bridger Pipeline Expansion Project ("Bridger Pipeline"), which is a crude oil pipeline that will extend from an area near the U.S.-Canada border in Phillips County, Montana, and run approximately 650-miles east and south through Montana and Wyoming, terminating near Guernsey, Wyoming. The Bridger Pipeline will traverse numerous waterbodies, including but not limited to major interstate and international river systems such as the Yellowstone, West Fork Poplar, Poplar, Missouri, Little Missouri, Belle Fourche, Cheyenne, Niobrara, North Platte, and Laramie Rivers, and at least 96 different features that are documented by FWS's National Wetland Inventory, including lakes, ponds, and seasonal wetlands or temporary areas. These rivers, waterways, and wetlands are also known to support federally listed species, including but not limited to the endangered pallid sturgeon, northern long-eared bat, and whooping crane, and the threatened Preble's meadow jumping mouse and piping plover, and therefore the Bridger Pipeline Expansion poses a substantial risk of harm to federally listed endangered and threatened species and their critical habitats.

38.    Plaintiffs have members who regularly visit, recreate in, and enjoy the areas affected by the Bridger Pipeline for the purpose of observing, studying, photographing, and otherwise enjoying wildlife, including federally listed endangered and threatened species and their critical habitats. The Bridger Pipeline creates a substantial risk of injury to those species and habitats, which in turn harms Plaintiffs' members' recreational, aesthetic, professional, scientific, educational, and conservation interests by reducing their ability to view, study, and enjoy those species in the wild. For example, Center member Kenneth Midkiff has longstanding professional, aesthetic, and recreational interests in the Missouri River and the wildlife and migratory birds that rely on areas in and around the river, including endangered and threatened

16

species such as the pallid sturgeon, whooping cranes, interior least terns, and piping plovers. Mr. Midkiff regularly visits the Missouri River, especially for fishing and wildlife watching and has over the last few decades floated the Missouri River and its tributaries numerous times, and he has plans to continue to visit the Missouri river and its tributaries for recreation and wildlife viewing in the near future. The Bridger Pipeline threatens to degrade and fragment aquatic habitat, increase sedimentation and pollution, alter stream hydrology, and otherwise harm the freshwater species and ecosystems in which Mr. Midkiff has longstanding interests, including listed species inhabiting the Missouri River, thereby impairing Mr. Midkiff's ability to observe and enjoy such species and their habitats.

39.    In addition, Sierra Club and MEIC member Nick Gevock has longstanding recreational, aesthetic, and professional interests in the eastern Montana uplands and Yellowstone River areas that the Bridger Pipeline would cross. That includes the wildlife, undisturbed landscapes, and upland game birds and big game that rely on these areas, including endangered and threatened species such as the sage grouse. Mr. Gevock regularly visits the lower Yellowstone River valley for upland game bird hunting with his pointing dog, and he travels to eastern Montana outside of Broadus for wildlife watching and big game and upland game bird hunting, and he has plans to continue to visit eastern Montana and the lower Yellowstone River valley and its tributaries for recreation, hunting, and wildlife viewing in the future. The construction and operation of the Bridger Pipeline through both waterways and uplands, including the creation of a permanent right of way, would degrade and disturb the terrestrial and aquatic habitat along the pipeline's proposed route, disturb soils and native vegetation, increase sedimentation and pollution, and otherwise harm ecosystems in which Mr. Gevock has longstanding interests. It would also imperil and/or displace species inhabiting the eastern

17

Montana uplands and Yellowstone River valley, thereby impairing Mr. Gevock's ability to hunt, observe, and enjoy such species and their habitats.

40.     Plaintiffs are also aware of a pipeline project in Texas that, upon information and belief, has been or will imminently be verified to use NWP 12: the Saguaro Connector Pipeline Project ("Saguaro Pipeline"). The Saguaro Pipeline includes an approximately 155-mile long section of "intrastate" pipeline that would transport natural gas from Pecos County to Hudspeth County, Texas, which will cross dozens of waterways and at least two major rivers; and a 1000-foot section that would cross Rio Grande River at the United States Mexico border, about 18 miles southwest of Sierra Blanca in Hudspeth County, Texas (i.e., the "Border Facility"). This pipeline project poses a substantial risk of harm to federally listed endangered and threatened species and their critical habitats in Texas including, but not limited to, the endangered northern aplomado falcon and southwestern willow flycatcher, and the threatened Mexican spotted owl, piping plover, red knot, and yellow-billed cuckoo.

41.     Plaintiffs have members who are directly affected by the Saguaro Pipeline, including members who regularly visit, recreate in, and enjoy areas affected by this pipeline for the purpose of observing, studying, photographing, and otherwise enjoying the listed species and their critical habitats. The authorization and use of NWP 12 for the Saguaro Pipeline creates a substantial risk of injury to those species and habitats, which in turn harms Plaintiffs' members' recreational, aesthetic, professional, scientific, educational, and conservation interests by reducing their ability to view, study, and enjoy those species in the wild. For example, Sierra Club member Bill Addington lives in Sierra Blanca, Texas, and owns property directly downstream of the Saguaro Pipeline's crossing of the Rio Grande River in Hudspeth County, Texas. He regularly visits and uses the area that would be affected by the Saguaro Pipeline for

recreation, wildlife observation, and enjoyment of its natural character. Construction and operation of the Saguaro Pipeline would diminish his use and enjoyment of his property and the affected area by degrading water quality, disrupting wildlife and wildlife habitat, increasing noise levels, and permanently altering scenic views through the creation of a large pipeline right-of-way across an otherwise remote and undeveloped landscape. The construction of the pipeline would adversely impact water quality on the Rio Grande, and poses a risk of frac-outs from horizontal directional drilling.

42.    As another example, the ANR Heartland Project is a pipeline that, upon information and belief, has been or imminently will be verified to utilize NWP 12, and which poses a substantial risk of harm to federally listed endangered and threatened species. This project consists of 68.9 miles of new pipeline in Illinois and Wisconsin and replacing 1.5 miles of pipeline in Wisconsin on the existing ANR Pipeline, a 9,367-mile interstate pipeline that transports natural gas from Texas, Oklahoma, and Louisiana to the Midwest states of Wisconsin, Michigan, Illinois, and Ohio. The proposed ANR Heartland Project will also require the construction of three compressor stations and uprating compressor units at an existing compressor station in Illinois and Wisconsin. The ANR Heartland Project will traverse approximately 44 waterbodies and affect at least 39.5 acres of wetlands that support sensitive species and ecosystems, including but not limited to the Kishwaukee, Sheboygan, Sumiaco, Milwaukee, and Fox Rivers, and Poplar, Mink, Aux Sable, Jackson, Brush, Welch, Eagle, Big Rock, and Little Rock Creeks. These habitats are also known to support federally listed species, including but not limited to the endangered rusty patched bumble bee, Hine's emerald dragonfly, sheepnose mussel, whooping crane, Indiana bat, and the northern long-eared bat.

43.     Plaintiffs have members who are directly affected by the ANR Heartland Project who regularly visit, recreate in, and enjoy areas affected by the ANR Heartland Project for the purpose of observing, studying, photographing, and otherwise enjoying federally listed endangered and threatened species and their critical habitats. The authorization and use of NWP 12 for the ANR Heartland Project creates a substantial risk of injury to those species and habitats, which in turn harms Plaintiffs' members' recreational, aesthetic, professional, scientific, educational, and conservation interests by reducing their ability to view, study, and enjoy those species in the wild. For example, Cheryl Nenn, a member of Waterkeeper Alliance and the Milwaukee Riverkeeper for approximately twenty-three years, regularly visits and works throughout the Milwaukee River watershed, including Chambers, Nichols, Stony, and Mink Creeks, and the North Branch of the Milwaukee River. As part of her work, Ms. Nenn frequently conducts water quality monitoring, fisheries monitoring, mussel monitoring, habitat restoration work, and dam removal projects in these areas, and she also regularly recreates there by hiking, fishing, birdwatching, camping, paddling, and photographing wildlife and natural landscapes. She has visited the affected areas repeatedly, including as recently as March 2026, and plans to return numerous times during 2026 for both work and recreation, including planned visits to camp within the Kettle Moraine State Park area in June 2026. Ms. Nenn has longstanding interests in protecting the Milwaukee River watershed and its high-quality trout streams, freshwater mussels, migratory bird habitat, and federally listed species, including the Hine's emerald dragonfly and their habitats. The authorization, construction, and operation of the ANR Heartland Pipeline threatens to degrade and fragment aquatic and wildlife habitat, increase sedimentation and pollution, alter stream hydrology and temperature, reduce riparian shade critical to cold-water fisheries, and contribute to cumulative impacts from existing and proposed

20

utility corridors and transmission infrastructure. Such harms impair Ms. Nenn's ability to study, observe, advocate for, restore, and enjoy these species and habitats and undermine her ongoing conservation, educational, scientific, and recreational activities that are directly tied to and dependent upon an ecologically intact and healthy Milwaukee River.

44.     As another example, the Desert Southwest Expansion Project ("Desert Southwest Pipeline") is a proposed interstate natural gas pipeline that, upon information and belief, will imminently be authorized under NWP 12, has more than minimal individual and cumulative environmental impacts, and poses a substantial risk of harm to federally listed endangered and threatened species and their habitats. The Desert Southwest Pipeline consists of approximately 520 miles of new pipeline extending from Winkler County, Texas, through New Mexico and Arizona to Coolidge, Arizona, with approximately 186 miles of laterals and interconnects and new compression facilities at nine compressor stations. The Desert Southwest Pipeline is designed to transport up to 2.3 billion cubic feet of natural gas per day through portions of the Permian Basin, the Chihuahuan and Sonoran Deserts, and numerous ecologically significant watersheds in southern Arizona and New Mexico. The proposed route traverses at least three major perennial rivers, including but not limited to the Pecos River, Rio Grande, and Salt Creek, and it traverses or lies adjacent to dozens of intermittent streams, washes, riparian corridors, wetlands, and groundwater-dependent ecosystems, including resources associated with the San Pedro, Lower San Pedro, and San Simon Rivers, and other tributaries and drainages that support sensitive species and habitats. These areas are known to provide habitat for federally listed and sensitive species, including but not limited to the southwestern willow flycatcher, yellow-billed cuckoo, Mexican spotted owl, Gila topminnow, desert pupfish, and numerous other species dependent on riparian and aquatic ecosystems. Construction and operation of the Desert

21

Southwest Pipeline, including trenching, horizontal directional drilling, vegetation clearing, and associated infrastructure development, threaten sensitive species and their habitats through direct disturbance, habitat fragmentation, and impacts to streams, washes, wetlands, riparian areas, wildlife corridors, groundwater-dependent ecosystems, and surface and subsurface hydrology.

45. Plaintiffs have members who are directly affected by the Desert Southwest Pipeline. For example, Center member Melissa Crytzer Fry resides on property downstream of the proposed Desert Southwest Pipeline corridor in the Lower San Pedro watershed. Mammoth Wash crosses her property and flows into the San Pedro River, creating a direct hydrologic connection between her property and the aquatic and riparian resources that would be affected by the Desert Southwest Pipeline. Ms. Crytzer Fry regularly hikes, observes, studies, and photographs wildlife and enjoys the scenic and ecological resources of her property and surrounding areas within the Lower San Pedro watershed, including Mammoth Wash, San Pedro River, Aravaipa Creek, Copper Creek, Tucson Wash, lands near Oracle State Park, and the 7B Trail. On her property, she maintains trail cameras, photographs wildlife, conducts wildlife observations, and participates in bird surveys. She has observed numerous species in these areas, including migratory birds, reptiles, mammals, and federally listed species such as the southwestern willow flycatcher, yellow-billed cuckoo, and Mexican spotted owl. She intends to continue these activities regularly, including bird-survey work and visits throughout the mesquite bosque along the Lower San Pedro River and its tributaries, in 2026 and beyond. Ms. Crytzer Fry also serves as Chair of the Lower San Pedro Watershed Alliance, where she participates in watershed-protection and scientific activities throughout the Lower San Pedro watershed, including groundwater and hydrological studies, groundwater modeling, volunteer well monitoring, wet-dry mapping, bird surveys, and conservation efforts in areas that would be

affected by the Desert Southwest Pipeline. The pipeline's construction and operation, including horizontal directional drilling and other ground-disturbing activities, threaten streams, washes, wetlands, riparian habitat, wildlife corridors, and groundwater-dependent ecosystems within the watershed. These impacts could affect the groundwater systems that sustain the region's mesquite bosque and other habitats on which wildlife depends. The Desert Southwest Pipeline, associated infrastructure, and increased human disturbance would degrade the natural character and ecological integrity of the area, diminish Ms. Crytzer Fry's opportunities to observe and photograph wildlife, interfere with wildlife movement, and impair her recreational, aesthetic, scientific, professional, conservation, and spiritual enjoyment of her property and the Lower San Pedro watershed. These harms would diminish her use and enjoyment of the area, frustrate her ongoing conservation and scientific activities, and reduce her opportunities to observe, study, monitor, photograph, and enjoy wildlife and their habitats.

46.    Sierra Club member Bill Addington would also be directly affected by the Desert Southwest Pipeline. The pipeline would cross Hudspeth County, Texas, through areas in which Mr. Addington recreates. For example, the Desert Southwest Pipeline would be constructed directly through the Salt Flats in Hudspeth County, which is a vast desert expanse located about 45 miles northeast of Sierra Blanca. The salt flats are home to the salt playa fairy shrimp, which are a species of small shrimp that remain dormant in the dry, salty earth for years and only emerge to mature and lay eggs after heavy rains. Mr. Addington enjoys visiting the Salt Flats and observing the vast, unspoiled expanses, and looking for fairy shrimp after heavy rainfalls. His enjoyment of the Salt Flats would be diminished by the installation of the Desert Southwest Pipeline, which would adversely affect fairy shrimp populations and create a permanent pipeline right-of-way that would scar the landscape.

47.     In addition to the specific pipelines described above, upon information and belief, NWP 12 authorizes the construction of many other oil and gas pipelines that would directly impact the interests of Plaintiffs and Plaintiffs' members, including but not limited to the Targa Speedway Natural Gas Liquids Pipeline in Texas, the Critical Energy Reliability Link gas pipeline in Colorado, and the Marais Pipeline in Louisiana.

48.     These and other pipelines that have been or will imminently be verified to utilize NWP 12 pose significant risks to ESA-listed species and their critical habitats. Pipeline construction activities—including trenching, streambed excavation, grading, and right-of-way clearing—increase turbidity, destabilize stream substrates, and degrade water quality, thereby impairing feeding, reproduction, and survival of aquatic species—particularly freshwater mussels, fish, and amphibians that depend on clean water and stable habitats—and other wildlife that depend on these areas, such as protected migratory birds. These impacts can spread downstream within hydrologically connected systems, compounding harmful effects across entire watersheds. Clearing and maintenance of pipeline corridors fragments forested landscapes, disrupts migration and breeding patterns, and reduces the availability of suitable habitat for terrestrial species. Operation of compressor stations further contributes to chronic environmental stressors, including noise, air pollution, and habitat disturbance. NWP 12-authorized activities create a substantial likelihood of direct mortality, habitat degradation, and cumulative impacts that may result in the "take" of federally listed species and the destruction or adverse modification of critical habitat, which directly affects the interests of Plaintiffs and their members in protecting, studying, and enjoying these species.

49.     The Corps' unlawful authorization of NWP 12 further threatens the use, enjoyment, and economic value of property owned by Plaintiffs' members, as well as the

24

waterways that members use and enjoy both as a source of drinking water and for recreation, as well as for the habitat they provide for plants and animals. For example, a spill or frac-out from an NWP 12-approved pipeline on or near a member's land or a waterway that Plaintiffs' members use and enjoy would interfere with use and enjoyment of the area, threaten water supplies, and decrease property values. Similarly, the negative ecological effects of pipeline construction through streams and rivers—such as increased sedimentation, pollution, chemical and oil spills, and other harm to protected species—would interfere with Plaintiffs' members' use and enjoyment of those waterways and the wildlife they support.

50. Plaintiffs' members have researched, studied, observed, and sought protection for endangered species that are adversely affected—and whose survival and recovery are threatened—by NWP 12-authorized activities. Plaintiffs' members and staff have visited and observed or sought out threatened and endangered species that are imperiled by NWP 12, and enjoy hiking, fishing, and observing wildlife in wetlands and along rivers and streams that are impacted by NWP 12 activities. Plaintiffs' members intend to continue to visit and observe, or attempt to visit and observe, these species in the near future.

51. Plaintiffs' members derive scientific, recreational, spiritual, and aesthetic benefits from imperiled species' existence in the wild. Their interest in maintaining and protecting the species inhabiting rivers, streams, and wetlands affected by NWP 12 activities is entirely dependent on the continued existence of healthy, sustainable, and accessible ecosystems and populations. Any activities that "may affect" or destroy, degrade, or diminish these areas, or that kill, injure, harm, harass, or displace populations of listed species, interfere with Plaintiffs' members' use and enjoyment of the areas and species.

25

52.     Plaintiffs' members include scientists who study various endangered and threatened species affected by NWP 12-auhtorized activities, and whose interests in studying and enjoying these species and their habitats are entirely dependent on the continued existence of such species. Any action, such as pipeline construction across waterways and wetlands pursuant to NWP 12, that interferes with and harms these species also harms those members' interests and enjoyment in studying those species. Any loss of individuals or habitat from NWP 12 activities would hamper their ability to undertake such research in the future, thereby harming their academic and aesthetic interests in those species.

53.     The Corps' failure to ensure, through ESA consultation, that the NWP 12 program will not jeopardize protected species directly and irreparably injures Plaintiffs' interests in such species. The Corps' failure to comply with the requirements of the ESA delays, avoids, and undermines protections that are necessary to secure Plaintiffs' and their members' interests in the existence of listed species and their critical habitat.

54.     The Corps' failure to comply with the ESA and its decision to delegate to permit applicants the threshold determination as to whether their use of NWP 12 may even affect a listed species means that Plaintiffs and their members may never even learn about—let alone be in a position to seek to ameliorate—the impacts of NWP 12 projects on listed species and critical habitats of vital interest to Plaintiffs and their members.

55.     Plaintiffs have also suffered procedural and informational injuries from Defendants' violations. These injuries are connected to Plaintiffs' substantive recreational, scientific, spiritual, and aesthetic interests. Plaintiffs' members rely on Defendants to comply with the requirements of the ESA, NEPA, and the CWA. Plaintiffs rely on these laws to achieve their organizational purposes, including monitoring the impacts of agency actions on the

26

environment and listed species; monitoring legal compliance concerning environmental management; educating members, directors, staff, and the public about species management and the state of the environment; and advocating for policies that protect habitats and wildlife.

56.    Because many NWP 12-authorized activities proceed without any notification to the Corps and even when such notification is provided there is no public notice or opportunity for public engagement, Plaintiffs are unable to participate meaningfully in any project-specific review process under the ESA, NEPA, and CWA. Plaintiffs and their members routinely engage in such review processes for pipeline projects when they do occur (e.g., under an individual Section 404 permit review), but NWP 12 effectively shuts them out of the process altogether.

57.    Defendants' actions have stifled the flow of data on impacts to the environment from pipeline construction that are vital to Plaintiffs' efforts to conserve and protect the environment. The Corps' failure to consult with the Services on NWP 12 and to comply with its ESA, NEPA, and CWA obligations is therefore harming and will continue to harm Plaintiffs by undermining their ability to protect their interests.

58.    The Corps' unlawful issuance of NWP 12 also harms Plaintiffs' interests because NWP 12 authorizes major pipeline projects that otherwise would be required to apply for individual permits, thereby triggering the Corps' affirmative duty to publicly disclose information regarding such projects and their adverse impacts. The Corps' violations mean that instead of receiving such information in the ordinary course of individual permit processing and having an opportunity for public comment on individual permit applications, Plaintiffs must instead attempt to learn through other means precisely when and where NWP 12 is being invoked, with no assurance of ever being able to uncover such information in a timely and effective manner. This constitutes a serious informational injury that flows directly from the

27

Corps' unlawful issuance of a nationwide permit covering major oil and gas pipelines that, under the law and based on the record before the Corps, have more than minimal effects on the environment and thus require individual CWA Section 404 permits.

59.    These are actual, concrete injuries to Plaintiffs, caused by the Corps' failure to comply with the ESA, NEPA, the CWA, and implementing regulations. The interests of Plaintiffs and their members are directly and irreparably injured by Defendants' violations of law as described in this Complaint. Unless this Court grants the requested relief, harm to the environment and protected species will continue to accrue, and the aesthetic, recreational, educational, professional, scientific, spiritual, and conservation interests of Plaintiffs and their staff and members will continue to be adversely affected.

60.    The relief Plaintiffs seek in this lawsuit will redress their injuries by requiring the Corps to comply with the ESA, NEPA, and CWA, and by vacating the permit that is causing their injuries. The relief will also ensure that the Corps evaluates the direct, indirect, and cumulative impacts of oil and gas pipelines before deciding whether that category of activities qualifies for NWP 12 authorization; will prevent Plaintiffs from being further harmed by the streamlined authorization of oil and gas pipelines under NWP 12; and will give Plaintiffs and their members more comprehensive and complete information, as well as an opportunity for participation in the approval process, by relegating oil and gas pipelines to the individual permit process.

**<u>Defendants</u>**

61.    Defendant U.S. Army Corps of Engineers ("Corps") is the federal agency charged with administering permits under Section 404 of the CWA for discharge of dredged or fill material into the waters of the United States. The Corps is headquartered in Washington, D.C.

28

62.     Defendant William H. Graham, Jr., is Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers headquartered in Washington, D.C. and is designated to act for the Secretary of the Army. Plaintiffs bring this action against Lieutenant General Graham in his official capacity only. Lieutenant General Graham is the federal officer personally responsible for compliance with any injunction that this Court issues.

## LEGAL BACKGROUND

### The Clean Water Act and Nationwide Permits

63.     Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

64.     To achieve this goal, Section 404 of the CWA prohibits the discharge of any pollutant, including dredged soil or other fill material, into navigable waters unless authorized by a permit. *Id.* §§ 1311, 1344.

65.     Section 404 of the CWA gives the Corps primary responsibility for permitting construction activities that involve dredge and fill of U.S. waters. *Id.* § 1344(a), (d). The Corps oversees the Section 404 permit process and must comply with guidelines promulgated by the U.S. Environmental Protection Agency ("EPA"), which are incorporated into the Corps' own regulations. *Id.* § 1344(b)(1); 33 C.F.R. §§ 320.4(b)(4), 325.2(a)(6). The objective of these "404(b)(1) guidelines," set forth at 40 C.F.R. Part 230, is to prevent unacceptable adverse impacts to the nation's aquatic ecosystems from the discharge of dredged or fill material. 40 C.F.R. § 230.1(c).

66.     CWA Section 404(e) allows the Corps to, "after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the [Corps] determines that the

29

activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

67. NWPs can last up to five years, at which point they must be reissued or left to expire. *Id.* § 1344(e)(2); 33 C.F.R. §§ 330.5, 330.6(b). NWPs are "designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." *Id.* § 330.1(b).

68. The Corps must evaluate the cumulative effects of the activities proposed to be covered by an NWP before it is issued. *See, e.g.*, 33 U.S.C. § 1344(e)(1); 33 C.F.R. § 323.2(h); 33 C.F.R. § 320.4; 40 C.F.R. § 230.7(b).

69. Once an NWP is issued, specific projects that meet the terms and conditions of that NWP may proceed without obtaining an individual Section 404 permit. Projects permitted via an NWP are not subject to public participation and do not go through the more comprehensive, site-specific environmental- and public-interest review required for individual CWA Section 404 permits. *See* 33 C.F.R. § 323.3(a).

70. In most cases, permittees may proceed with activities authorized by NWPs without notifying the Corps at all. *Id.* § 330.1(e)(1).

71. In some cases, however, permittees must notify Corps district engineers of their projects through submission of a preconstruction notification ("PCN") and await verification before the project may proceed under the NWP. *Id*. §§ 330.1(e)(1), 330.6(a).

72. If, upon receiving a PCN, the Corps district engineer decides that an activity does not comply with the terms or conditions of an NWP, the district engineer must deny verification and require an individual CWA Section 404 permit. *Id.* § 330.6(a)(2).

73.     If the district engineer determines that an activity does comply with the terms and conditions of an NWP, the district engineer will notify the permittee that the project is verified under the NWP. *Id.* § 330.6(a)(3).

74.     The district engineer may add conditions on a case-by-case basis to ensure the activity will have only minimal individual and cumulative adverse effects on the environment and will not be contrary to the public interest. *Id.* § 330.6(a)(3)(i).

75.     Ordinarily, once a permittee has submitted a PCN for a project under an NWP, it may presume that the project qualifies for the NWP unless otherwise notified by the district engineer within a 45-day period. *Id*. § 330.1(e)(1).

76.     The Corps does not issue any public notice or allow any opportunity for public involvement when a PCN is submitted or when a project is verified under an NWP. *See id*. § 330.1(e).

77.     Corps regulations implementing the CWA provide that two or more different NWPs can be combined to authorize a project, but "the same NWP cannot be used more than once for a single and complete project." *Id*. § 330.6(c).

78.     Corps division engineers may prepare supplemental documentation for NWPs, make modifications, and add regional conditions. *Id*. § 330.5(c)

## The Endangered Species Act

79.     In enacting the ESA, Congress's plain intent in passing the ESA was to halt and reverse the trend toward species extinction, whatever the cost, and that endangered species be afforded the highest of priorities.

80.     The ESA provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and establishes "a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

81.     The ESA assigns responsibility to implement the statute to the Secretaries of Commerce and Interior, which in turn have delegated responsibility to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service, respectively. 50 C.F.R. § 402.01.

82.     To fulfill the ESA's substantive purposes, all federal agencies are required to engage in Section 7 consultation with the Services to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(2). To "jeopardize" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of . . . the survival [or] recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

83.     The ESA's regulatory definition of "action" is broad and includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," which includes the promulgation of regulations, the granting of permits, or actions directly or indirectly causing modifications to the land, water, or air. *Id*.

84.     Section 7(a)(2) and its implementing regulations set forth a detailed process that federal agencies must follow before taking or approving actions that "may affect" threatened or endangered species or critical habitat. Federal agencies must follow and complete Section 7(a)(2)'s consultation procedures in order to fulfill the ESA's substantive mandate to "insure" that any agency action "is not likely to jeopardize the continued existence of any endangered

32

species or threatened species or result in the destruction or adverse modification of [designated critical] habitat." 16 U.S.C. § 1536(a)(2), (c)(1).

85. In fulfilling the requirements of Section 7(a)(2) and the procedural requirements set forth in 50 C.F.R. Part 402, agencies must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

86. Each federal action agency—here, the Corps—has a duty to determine whether any actions it authorizes require consultation. *See* 50 C.F.R. § 402.14(a).

87. An action agency must "review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." *Id.*; *see also* 16 U.S.C. § 1536(c)(1). The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," and thus is easily triggered. 51 Fed. Reg. 19926, 19949 (June 3, 1986).

88. The "action area," includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

89. If the federal action is "likely to adversely affect" listed species or critical habitat, the action agency must engage in "formal consultation" with the Services to fulfill the ESA Section 7(a)(2)'s substantive "no jeopardy" mandate. *Id.* § 402.14; *see* 16 U.S.C. § 1536(a)(2). The threshold for triggering this formal consultation requirement is very low. *See* 51 Fed. Reg. at 19949-50.

90. Formal consultation commences with the action agency's written request for consultation and concludes with the Services' issuance of a "biological opinion." 50 C.F.R. § 402.02; *see id.* § 402.14(c), (g)(4).

91.    During formal consultation, the Services and the action agency must evaluate the "[e]ffects of the action," including all direct and indirect effects of the proposed action, plus the effects of actions that are interrelated or interdependent, added to all existing environmental conditions—that is, the "environmental baseline." *Id.* §§ 402.02, 402.14(g)(3). "The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area . . . ." *Id.* § 402.02. The effects of the action must be considered together with "cumulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

92.    The biological opinion is the heart of the formal consultation process and states the Services' opinion as to whether the effects of the action are "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4), (h)(3); *see* 16 U.S.C. § 1536(a)(2), (b)(3)(A). If the Services determine that the action will incidentally "take" a listed species but *is not* likely to jeopardize the species or destroy or adversely modify critical habitat, the Services must provide an "incidental take statement" ("ITS"). *Id.* § 402.14(g)(7). The ITS must specify the impact of the taking on the listed species, set forth any "reasonable and prudent measures" ("RPMs") that are necessary or appropriate to minimize the impact, and provide "terms and conditions" that the action agency must comply with to implement the RPMs and avoid jeopardy to the species. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). If the Services determine that the action *is* likely to jeopardize listed species or destroy or adversely modify critical habitat, FWS must suggest "reasonable and prudent alternatives" ("RPAs") to the action, if any exist, that will avoid jeopardy and "which [the agency] believes would not violate [Section 7(a)(2)]." 16 U.S.C. §

1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). The Services may also "suggest modifications" to the action during the course of consultation "to avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13(b).

93.     For federal programs that may affect listed species, agencies must also engage with the Services in "programmatic consultation" to guide the implementation of such programs by establishing standards, guidelines, or governing criteria to avoid, minimize, or offset the effects of the program on ESA-listed species and critical habitat, and to establish protocols to track and respond to the collective impacts of actions taken pursuant to the program. *See* 50 C.F.R. § 402.02 (defining "programmatic consultation" as "a consultation addressing an agency's multiple actions on a program, region, or other basis" and explaining that such consultation allows the Services to consult on the effects of programmatic actions such as "[a] proposed program, plan, policy, or regulation providing a framework for future proposed actions.").

94.     Pursuant to the Services' revised regulations defining "framework programmatic action," programmatic consultations require that any incidental take be subsequently authorized under a project-specific Section 7 consultation. *See* 80 Fed. Reg. 26832, 26837 (May 11, 2015) (adding definition of "framework programmatic action" to 50 C.F.R. § 402.02 and adding 50 C.F.R. § 402.14(i)(6) to clarify that incidental take statements generally will not be issued at the programmatic level). Such project-specific consultation, however, "does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole." *Id.* § 402.14(c)(4).

95.     The Services' ESA regulations provide that for programmatic actions, such as the Corps' issuance of NWP 12, programmatic consultations and project-specific consultations work in tandem, with each playing a vital role in protecting imperiled species. *See* 84 Fed. Reg. at

35

44976 (reiterating that, "[a]s explained in the 2015" regulations, the ESA "still requires a programmatic consultation to meet the requirements of section 7(a)(2)[,]" even if "specific projects . . . developed in the future . . . are subject to site-specific stepped-down, or tiered consultations where incidental take is addressed").

## The National Environmental Policy Act

96.     NEPA is our basic national charter for the protection of the environment. NEPA's goals are to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare" of all people, and (3) "encourage productive and enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321.

97.     In creating NEPA, Congress recognized that "each person should enjoy a healthful environment" and NEPA therefore requires that the federal government use all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." *Id.* § 4331(b)–(c).

98.     NEPA's aims are twofold: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011); *see also* 42 U.S.C. § 4332(2)(C).

99.     To fulfill these purposes, Section 102(C) of NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the

36

relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

100.    To accomplish this, NEPA requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement—the environmental impact statement ("EIS")—must describe the environmental impacts of the proposed action. *Id.* § 4332(2)(C)(i), (ii). An agency is required to prepare an EIS if substantial questions are raised as to whether a proposed action may significantly affect the quality of the human environment. *Id.* § 4336(b)(1).

101.    An agency may prepare an environmental assessment ("EA") to determine whether the proposed action may have significant impacts, thus requiring preparation of an EIS. 42 U.S.C. § 4336(b)(2).

102.    The Corps has promulgated rules implementing NEPA; however, the Corps published an interim final rule partially rescinding its prior NEPA rules on July 3, 2025, effective immediately. 90 Fed. Reg. 29461 (July 3, 2025). The Corps then published a second interim final rule containing the Corps new NEPA regulations, also effective immediately. 90 Fed. Reg. 29465 (July 3, 2025). The Corps' new NEPA regulations, codified at 33 C.F.R. pt. 333, provide the agency's procedures for implementing and complying with NEPA when considering permit applications, including CWA Section 404 permits.

103.    The Corps' NEPA regulations explain that the scope of a NEPA analysis is based on the Corps' legal authority over the activity and whether the Corps has sufficient control and responsibility over any aspect of the applicant's proposed activity. 33 C.F.R. § 333.18(c)(2). The

Corps' regulations provide that the NEPA analysis should include the "reasonably foreseeable effects of the proposed activity and the alternatives considered." *Id.* §§ 333.15; 333.61.

104.    If the Corps determines that an activity is likely to have "reasonably foreseeable significant effects" on the environment, the Corps must prepare an EIS. *Id.* § 333.20. The EIS must include a "detailed statement" on the reasonably foreseeable environmental effects of the proposed action and on a reasonable range of alternatives to the proposed action, including an analysis of a "no action alternative" that "results in no construction requiring a Corps permit or permission." *Id.* § 333.23(b).

## The Administrative Procedure Act

105.    The APA provides for judicial review of agency actions such as those at issue here and provides the standard of review for ESA citizen suit claims. A reviewing court shall "hold unlawful and set aside" any Corps actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

## Environmental Impacts of NWP 12 Activities

106.    The Corps' issuance of NWP 12 will have myriad environmental impacts, including to waters of the United States and to endangered and threatened species and their critical habitats.

107.    The Corps estimates that NWP 12 will be used 3,700 times per year, or an expected 18,500 times during its five-year duration, resulting in direct impacts to approximately 1,500 acres of waters of the United States. 2026 NWP 12 Decision Document at 108.

108.    In general, oil and gas pipelines authorized under NWP 12 damage waterways and wildlife by destroying and fragmenting habitat, contaminating surface and groundwater, and

38

spreading invasive species. Pipeline construction and operation can discharge toxic chemicals, generate noise pollution, disturb aquatic and terrestrial habitats, and increase risks of leaks and spills. Related activities, including dredging and disposal during construction, release pollutants into critical ecosystems and threaten protected species, wildlife, and human communities.

109.    In addition to the harms caused by pipeline construction and operation, activities authorized under NWP 12 for appurtenant structures associated with oil and gas pipelines—such as compressor stations, pump stations, substations, meter stations, and related access roads—can cause significant and ongoing environmental damage. Construction, expansion, and maintenance of these facilities require vegetation clearing, excavation, grading, and stream and wetland crossings that destroy and fragment habitat, increase erosion and sedimentation, and degrade waterways relied upon by protected species. Compressor stations and related facilities also emit hazardous air pollutants, including methane, volatile organic compounds, nitrogen oxides, and particulate matter, which contribute to air pollution and climate change. These structures generate chronic noise, vibration, and artificial light that disrupt wildlife behavior, migration, breeding, and habitat use.

110.    In addition, spills, leaks, wastewater discharges, and stormwater runoff associated with NWP 12-authorized activities can contaminate surrounding soils, wetlands, groundwater, and surface waters, threatening aquatic ecosystems, wildlife, and nearby human communities.

111.    NWP 12 activities may significantly increase sediment loads in waterways, which can harm species such as endangered freshwater mussels and fish. In particular, NWP 12-authorized construction activities in waters can harm aquatic species by increasing downstream sedimentation, which fills the spaces between rocks that are essential for many species' survival and reproduction, including freshwater mussels, snails, darters and other benthic fishes,

39

crayfishes, and aquatic salamanders. The impacts to aquatic and water-dependent species from increased siltation and sedimentation are numerous, including both direct harm to species through gill clogging and injury, smothering, reduced visibility, and adverse changes to feeding, breeding, and sheltering substrates.

112.    NWP 12 authorizes the discharge of dredged or fill material into up to 1/2 an acre of waters of the United States, including wetlands and streams, even though approximately 43 percent of endangered and threatened species rely directly or indirectly on these aquatic ecosystems for survival. While the Corps characterizes this acreage limit as minimal at the individual-project level, the cumulative impacts of the thousands of NWP 12 authorizations issued each year result in substantial habitat loss, sedimentation, and degradation of aquatic resources nationwide. The authorized loss is particularly significant for small and sensitive aquatic features—such as vernal pools, prairie potholes, springs, seeps, and headwater streams—which provide essential habitat for imperiled species and can be wholly eliminated by a single project. As the Corps itself has acknowledged, the 1/2-acre limit would allow a headwater stream with a mean width of 20 feet to be filled for approximately 1,089 linear feet. 81 Fed. Reg. 35186, 35213 (June 1, 2016). Such losses are not minor, especially because headwater streams and small wetlands perform critical ecological functions, including water filtration, flood attenuation, nutrient cycling, and providing breeding, feeding, and refuge habitat for listed species and other wildlife. The cumulative destruction and fragmentation of these waters therefore has significant and far-reaching impacts on endangered species and the ecosystems upon which they depend.

113.    Horizontal directional drilling ("HDD") activities authorized under NWP 12 can significantly harm waters of the United States, endangered species, and other wildlife.[2] Although HDD is often promoted as a less disruptive method for crossing rivers, streams, and wetlands, it requires substantial surface disturbance, including vegetation clearing, excavation pits, staging areas, access roads, and heavy equipment operation. These activities fragment habitat, increase erosion and sedimentation, destabilize streambanks and substrates, and disrupt riparian and wetland ecosystems. Noise, vibration, and prolonged construction activity can interfere with breeding, migration, foraging, and sheltering behavior of protected species and other wildlife, while subsurface drilling may alter groundwater flow and damage sensitive aquatic habitats relied upon by federally protected species.

114.    HDD operations also present a substantial risk of "frac-outs," or inadvertent returns of drilling fluids into surrounding soils, groundwater, wetlands, streams, and rivers. These releases can introduce bentonite slurry and chemical additives into aquatic ecosystems, increasing turbidity, reducing water quality, and smothering fish spawning grounds, mussel beds, aquatic vegetation, and benthic habitat. Frac-outs may contaminate drinking water sources and sensitive wetlands, and because they can occur underground or remain undetected for extended periods, their impacts are often difficult to contain and remediate. Response and cleanup efforts frequently require additional excavation, vegetation removal, and stream disturbance, compounding the environmental harms caused by the underlying HDD activity.

---

[2] While pipelines that utilize HDD may avoid the direct discharge of fill material into waters of the U.S. and therefore may not independently trigger authorization under CWA Section 404, HDD activities remain subject to Section 10 of the Rivers and Harbors Act because they have the potential to affect or obstruct navigable waters. NWP 12 authorizes pipelines and related activities under both statutory authorities, and the Corps cannot avoid analyzing the impacts of HDD crossings simply because no fill material is discharged.

115.    NWP 12 construction and operational activities further alter natural hydrology by compacting soils, draining wetlands, modifying stream channels, and increasing impervious or disturbed surfaces associated with access roads, staging areas, and utility infrastructure. These disturbances can increase stormwater runoff, erosion, sediment transport, and downstream flooding, while reducing groundwater recharge and the water-retention functions of wetlands and floodplains. Such hydrologic changes degrade aquatic ecosystems and impair water quality relied upon by protected species and downstream communities.

116.    The use of NWP 12 poses a substantial risk of harm to federally listed endangered and threatened species and their habitats. NWP 12 authorizes activities associated with oil and gas pipeline construction, maintenance, and repair in streams, rivers, wetlands, and other waters of the United States, often across numerous aquatic resources within a single pipeline project. Such activities may involve trenching, blasting, HDD, clearing vegetation, disturbing streambed substrates, filling wetlands, and constructing access roads and related infrastructure. Many federally listed species inhabit or depend upon the streams, rivers, wetlands, floodplains, and riparian corridors that are routinely crossed or otherwise affected by NWP 12-authorized pipeline projects. These species include, but are not limited to, birds such as the endangered whooping crane and southwestern willow flycatcher and the threatened piping plover and yellow-billed cuckoo; fish such as the endangered pallid sturgeon, Alabama sturgeon, Colorado pikeminnow, and humpback chub; freshwater mussels such as the endangered clubshell, fanshell, spectaclecase, Higgins eye pearlymussel, and sheepnose mussel; mammals such as the endangered Indiana bat and northern long-eared bat; and invertebrates such as the endangered rusty patched bumble bee and Hine's emerald dragonfly. Pipeline crossings and associated construction activities may adversely affect these species through direct disturbance, habitat

42

fragmentation, increased sedimentation, degradation of water quality, alteration of stream channels and hydrology, destruction or degradation of nesting, spawning, breeding, foraging, and sheltering habitat, and disruption of migration, breeding, feeding, and other essential life-history functions. Because NWP 12 authorizes categories of activities that regularly occur in and adjacent to occupied habitat and designated critical habitat for federally protected species, its use for oil and gas pipeline projects presents an ongoing risk of take and habitat degradation affecting listed species throughout the United States.

117.    NWP 12-authorized activities can cause substantial harm to federally protected sturgeon species, including Atlantic sturgeon, Gulf sturgeon, shortnose sturgeon, and pallid sturgeon, as well as their designated critical habitat. Pipeline construction, trenching, dredging, blasting, and HDD in or near rivers and estuaries increase turbidity, sedimentation, underwater noise, and vibration that can disrupt migration, spawning, feeding, and sheltering behavior. Sediment deposition and drilling-fluid releases can smother spawning substrate, benthic habitat, and prey resources essential to juvenile and adult sturgeon survival. In-water construction activities may also create physical barriers or behavioral avoidance responses that interfere with migratory corridors between spawning and feeding grounds. Because Atlantic, Gulf, shortnose, and pallid sturgeon are long-lived, slow to mature, and already severely affected by habitat fragmentation and water-quality degradation, even temporary disturbances to aquatic habitat can impair reproduction, reduce survival, and contribute to long-term population declines.

118.    NWP 12-authorized activities associated with pipeline projects can significantly harm endangered freshwater mussels located within affected stream and river corridors. These species—often highly sedentary and dependent on stable, clean, flowing water—are particularly vulnerable to construction-related disturbances, including trenching, dredging, in-stream

excavation, and HDD. Such activities increase turbidity and sedimentation, which can smother mussels, clog feeding and respiratory structures, and degrade spawning and juvenile habitat. Sediment plumes and drilling-fluid releases can also alter substrate composition and water quality, reducing habitat suitability for species that require stable gravel or sand beds. Because many endangered mussels have complex life cycles that depend on specific fish hosts for larval dispersal, disruption of water quality and fish movement can further impair mussel reproduction and recruitment. Given their limited mobility and sensitivity to habitat disturbance, even short-term construction impacts within pipeline corridors can result in direct mortality and long-term population-level declines for imperiled mussel species.

119.    Pipelines authorized under NWP 12 also cause long-term forest fragmentation and edge effects that degrade wildlife habitat well beyond the immediate footprint of construction activities. Clearing and maintaining pipeline rights-of-way removes mature vegetation, creates permanent linear corridors through forests and wetlands, and exposes previously intact habitat to increased light, wind, invasive species, predators, and human disturbance. These changes disrupt migration patterns, reduce breeding success, and diminish habitat quality for forest-dependent species, including migratory birds, amphibians, and mammals.

120.    In addition, NWP 12 facilitates the expansion and continued operation of fossil fuel infrastructure that contributes significantly to greenhouse gas emissions and climate change. Oil and gas pipelines, compressor stations, and related facilities emit methane and other greenhouse gases directly during construction and operation, while enabling increased extraction, transport, and combustion of fossil fuels. Climate change driven by these activities exacerbates habitat loss, drought, wildfire, sea-level rise, ocean acidification, changing stream temperatures, and extreme weather events that threaten endangered species and aquatic ecosystems nationwide.

44

**The Corps' Reissuance of NWP 12 and Prior Litigation**

121.    In 2020, the U.S. District Court for the District of Montana held that the Corps violated Section 7 of the ESA in connection with its issuance of the 2017 version of NWP 12. Specifically, the court found that the Corps failed to engage in programmatic consultation with the Services regarding the cumulative effects of activities authorized under NWP 12 on ESA-listed species and designated critical habitat. *N. Plains*, 454 F. Supp. 3d at 994. The court concluded that the Corps' "no effect" determination was unlawful, declared NWP 12 unlawful, and remanded the permit to the Corps for compliance with the ESA. *Id.* at 994–95.

122.    The Montana district court declined to reach plaintiffs' claims under NEPA and the CWA. Instead, the court explained that it anticipated the ESA Section 7 consultation process would inform the Corps' analysis of NWP 12's environmental impacts under NEPA and the CWA. *Id.* at 995–96. The court thus recognized that consultation regarding the effects of activities authorized by NWP 12 was a critical prerequisite to the Corps' broader environmental review and permitting determinations in compliance with federal environmental laws.

123.    Despite the court's ruling, the Corps did not initiate ESA Section 7 programmatic consultation regarding the 2017 NWP 12. Rather, on January 13, 2021, the Corps published a final decision ("Final Decision") reissuing 12 of the existing NWPs and issuing four new NWPs. 86 Fed. Reg. 2744. The Final Decision included the reissuance of NWP 12, which authorized discharges of dredged or fill material into waters of the United States associated with the construction, maintenance, or repair of oil and gas pipelines, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States.

45

124. The 2021 NWP 12 was substantially the same as the 2017 NWP 12, with very few changes. Perhaps the most notable change was that NWP 12 would now be limited to oil and gas pipelines, while previous versions authorized a much broader category of linear utility projects.

125. In reissuing NWP 12, the Corps again determined that NWP 12 would have "no effect" on listed species and critical habitat and therefore did not require ESA consultation, relying on reasoning substantially similar to that rejected by the Montana district court in *Northern Plains Resource Council*.

126. On May 3, 2021, Plaintiffs in the instant case challenged the Corps' reissuance of NWP 12 in the U.S. District Court of Montana. *Ctr. for Biological Diversity v. Spellmon*, No. 4:21-cv-00047 (D. Mont. filed May 3, 2021). On August 18, 2022, the Montana District Court ordered the case to be transferred to the U.S. District Court for the District of Columbia. Venue Transfer Order, *Center for Biological Diversity v. Spellmon*, No. 4:21-cv-00047 (D. Mont. Aug. 18, 2022), ECF 97. The case was transferred to the D.C. District Court on September 9, 2022. *Ctr. for Biological Diversity v. Spellmon*, No. 1:22-cv-02586 (D.D.C. Sept. 9, 2022).

127. While that litigation remained pending, on June 18, 2025, the Corps published a proposal to reauthorize the NWP program. 90 Fed. Reg. 26100. The Corps also proposed to reissue the general conditions and definitions for all NWPs, with some modifications. *Id*.

128. On July 18, 2025, Plaintiffs in this matter, among many others, submitted comments to the Corps regarding the proposed 2026 NWPs, including NWP 12, outlining violations of the ESA, NEPA, and CWA that were substantially the same as the violations at issue in the litigation over the 2017 NWP 12 and the 2021 NWP 12, and since the Corps did not take any action to remedy those claims for the 2026 NWPs.

46

129.    The Corps published its final rule reissuing the NWPs on January 8, 2026, including a new iteration of NWP 12. 91 Fed. Reg. 768 (Jan. 8, 2026). The 2026 nationwide permits became effective on March 15, 2026.

130.    Because the Corps' issuance of the 2026 NWP 12 superseded the 2021 permit and mooted Plaintiffs' challenges to the 2021 version of the permit, the parties stipulated to voluntary dismissal of the pending litigation on April 23, 2026.

**The Corps' Failure to Comply with the Clean Water Act**

131.    Although the use of NWP 12 is limited to oil and gas pipelines with up to 1/2-acre of loss of U.S. waters for each "single and complete project," the Corps defines that term as "that portion of the total linear project . . . that includes *all crossings of a single water of the United States (i.e., a single waterbody) at a specific location*." *Id.* at 885 (emphasis added). In other words, NWP 12 allows pipeline projects to use NWP 12 separately at each location where a pipeline project crosses a river, stream, or wetland. By contrast, non-linear projects can invoke NWP 12 only once for the overall project, unless the separate components of the project would have "independent utility" (i.e., if the components could function as stand-alone projects). *Id.*

132.    NWP 12 thus allows the Corps to treat numerous water crossings along a proposed pipeline project—which often number in the hundreds or thousands—as "single and complete projects" that each qualify separately under NWP 12. There is no limit to the number of times that a single pipeline project can use NWP 12, nor is there a maximum number of acres of water that a pipeline project can impact while still being authorized under NWP 12. Because the Corps treats each crossing separately, it does not use the total amount of loss attributable to a project to determine whether the half-acre threshold has been met.

133. The Corps attempts to rationalize this practice by claiming that water crossings on a linear pipeline are usually at "separate and distant" locations and/or separate watersheds along a pipeline route such that cumulative effects are dissipated. *See id.*

134. However, that justification is arbitrary and capricious because NWP 12 does not actually require that multiple crossings along a linear project be "separate and distant" or in separate watersheds; nor does it define the phrase "separate and distant" or impose any spacing requirements or require district engineers to actually make a "separate and distant" finding. In fact, projects permitted by NWP 12 often have ten or more water crossings per mile and dozens of water crossings on the same waterbody and/or watershed.

135. The Corps further claims that district engineers, upon receipt of a PCN for an NWP 12 project, will conduct a project-level review to determine whether the proposed activity, including the cumulative effects of all waterways crossed by the pipeline, "will result in no more than minimal individual and cumulative adverse environmental effects," as required by the CWA, 33 U.S.C. § 1344(e)(1), and the Corps' CWA regulations. *Id.* at 772; *see also id.* ("If, the district engineer determines, after considering mitigation, that a proposed NWP activity will result in more than minimal cumulative adverse environmental effects, he or she will exercise discretionary authority and require an individual permit for the proposed activity.").

136. However, NWP 12 requires a permittee to submit a PCN *only if* the proposed project meets certain criteria. *See, e.g.*, *id.* at 860, 877–78. If none of these criteria is met, a project proponent may commence with the activity under NWP 12 without notifying the Corps or the public at all.

137.    In fact, many project applicants proceed under NWP 12 without ever submitting a PCN or notifying the Corps, and thus the Corps district engineers lack the opportunity to evaluate the environmental effects of those projects at all.

138.    Even when the district engineers do review PCNs for specific pipeline projects, the practice of district engineers is to issue verifications without ever conducting any meaningful cumulative effects review of the overall pipeline project.

### The Corps' Failure to Comply with the ESA

139.    Pipelines constructed in U.S. waters pursuant to NWP 12 "may affect" and are "likely to adversely affect" species listed under the ESA and/or destroy or adversely modify designated critical habitat, including through construction-related habitat loss and degradation as well as leaks and spills of oil into Corps' jurisdictional waterways, with disastrous impacts on aquatic resources.

140.    In its Decision Document for NWP 12, the Corps acknowledged the potential for harm to the environment and species that rely on areas affected by NWP 12-authorized activities, including from inadvertent returns of drilling fluids; fragmentation of terrestrial and aquatic ecosystems; leaks and spills of petroleum products; conversion of wetlands resulting in loss of wetland functions as well as permanent loss of wetland habitat and alteration of natural drainage patterns; and adverse effects on water quality from increases in sediments and pollutants in the water that impair the quality of fish and wildlife habitat by modifying or eliminating areas used for nesting, foraging, migration, resting, and reproduction.

141.    Pipeline construction and operation can also cause (and has caused) immediate and irreparable impacts to ecosystem functions of streams and adjacent wetlands through several means, including by: spreading invasive species; damaging soils; degrading water quality and

49

harming fish; causing cumulative impacts to bank stability and floodplain vegetation leading to erosion, sedimentation, release of toxic substances, and reduced biodiversity and productivity; converting forested wetlands to scrub wetlands; and causing cumulative adverse impacts from forest fragmentation, habitat loss, erosion, and sedimentation, and soil nutrient loss. These impacts adversely affect hundreds of listed species that rely on rivers, streams, and wetland habitats and other aquatic resources across the country.

142.    The Corps did not undertake any ESA Section 7 consultation with the Services regarding its reissuance of NWP 12 in 2021 to determine whether the NWP 12 program may jeopardize listed species or adversely modify critical habitat.

143.    Instead, the Corps concluded that programmatic consultation is not required because all NWP 12 projects that "may affect" listed species are subject to project-specific consultation pursuant to NWP General Condition 18, and therefore the Corps' issuance of NWP 12 has "no effect" on listed species. 90 Fed. Reg. at 26127–31, 26158.

144.    However, this is inconsistent with the Services' regulations, which require programmatic consultation even when project-specific review will subsequently occur. *See* 84 Fed. Reg. at 44,997 (noting the ESA still requires a programmatic consultation even if specific projects developed in the future are subject to site-specific consultations).

145.    The project-specific consultations triggered by NWP General Condition 18 cannot ensure that the NWP 12 program as a whole—including the collective impacts of thousands of activities permitted under NWP 12—will not result in jeopardy to listed species or adverse modification of critical habitat. Programmatic consultation is necessary to allow the Services to analyze the aggregate impacts of multiple projects under the NWP 12 program and to ensure that

appropriate program-wide criteria and safeguards are in place for tracking, avoiding, minimizing, and mitigating such impacts.

146.   The Services specifically stated that the NWP program required programmatic review when they issued the 2015 regulations defining framework programmatic consultations. *See* 80 Fed. Reg. at 26835 ("Examples of Federal programs that provide such a framework include . . . the U.S. Army Corps of Engineers' Nationwide Permit Program.").

147.   The Corps relies on permittees to submit PCNs pursuant to General Condition 18 when the permittees themselves acknowledge that their activities "might" affect listed species. *See* NWP 12 Decision Document at 16. This delegates the initial effects determination to the permittee. The PCN requirement set forth in General Condition 18 cannot ensure that the Corps will engage in project-specific Section 7 consultation for all projects utilizing NWP 12 that may affect listed species because there is no guarantee that a project applicant will submit a PCN for every water crossing that "might" affect a listed species.

148.   By written notice to Defendants dated April 3, 2026, Plaintiffs provided notice of intent to file suit more than sixty days prior to the filing of this Complaint, as required by the citizen suit provision of the ESA. 16 U.S.C. § 1540(g). Plaintiffs' notice letter demanded that Defendants initiate and complete programmatic ESA consultation on NWP 12. Defendants failed to respond or remedy the alleged violations, and therefore an actual, justiciable controversy exists within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

## The Corps' Failure to Comply with NEPA

149.   The Corps' reissuance of NWP 12 is a major federal action that requires compliance with NEPA. *See* 42 U.S.C. § 4332(2)(C). The Corps issued an EA and FONSI for its reissuance of NWP 12 dated January 8, 2026 (the "NWP 12 Decision Document").

150.    The NWP 12 Decision Document contains the Corps' only NEPA analysis for an estimated 3,700 uses of NWP 12 per year nationwide.

151.    The Corps will not prepare any further NEPA analysis for individual projects that are permitted, verified, or authorized by NWP 12. *See, e.g.*, 90 Fed. Reg. at 26106 ("For the issuance of an NWP, compliance with the requirements of [NEPA] is completed when Corps Headquarters issues the final rule for the NWP along with the national decision document for that NWP. The national decision document for each NWP includes an environmental assessment and a finding of no significant impact."). In fact, for oil pipelines and intrastate gas pipelines, there is no guarantee that any other federal agency will conduct any project-level NEPA review because there is no federal statute governing oil pipeline permitting.

152.    The NWP 12 EA is narrowly limited to discussing the general impacts of discharges of fill material into waterways. It does not discuss the full range of direct, indirect, and cumulative impacts associated with oil and gas pipelines and related infrastructure permitted by NWP 12.

153.    For example, the NWP 12 EA does not evaluate the risks or impacts of pipeline leaks and spills into waterways, nor does it discuss the various types of oil and gas transported by pipelines permitted by NWP 12 or their respective characteristics, impacts, or spill response requirements. Instead, the Corps' NWP 12 EA simply states:

> Congress has not granted the Corps statutory authority to take actions to prevent or control potential leaks or spills that may occur during the construction or operation of oil or natural gas pipelines. Since the Corps does not regulate the release of oil, natural gas, or products derived from oil or natural gas, the Corps is not required to perform a detailed analysis of the effects of those possible future leaks or spills because those leaks or spills are not an effect of the Corps' proposed action.

NWP Decision Document at 145.

154.     The NWP 12 EA acknowledges that oil and gas pipeline crossings constructed with HDD technology presents a risk of "frac-outs," or "inadvertent returns of drilling fluids to waters of the United States," which occur when pressurized fluids and drilling lubricants escape the active drilling bore, migrate up through the soils or bedrock, and are released to the surface at or near the construction site or in the waterbody. NWP 12 Decision Document at 143. However, the NWP 12 EA fails to evaluate those risks or impacts, instead simply concluding: "The Corps does not have jurisdiction to regulate or enforce inadvertent returns, leaks, or spills that may occur during horizontal directional drilling to install or replace oil or natural gas pipelines." *Id.*

155.     The NWP 12 EA also does not evaluate the impacts associated with the permanent conversion of forested wetlands to lesser quality wetlands associated with pipeline rights-of-way. However, the EA does acknowledge that forested wetland will be permanently converted. *See, e.g.*, NWP 12 Decision Document at 95 ("The construction of oil or natural gas pipeline rights-of-way through forested wetlands may result in the conversion of forested wetlands to scrub-shrub or emergent wetlands. Those conversions may be permanent to maintain the oil or natural gas pipeline in good, operational order. The conversion of wetlands to other types of wetlands may result in the loss of certain wetland functions, or the reduction in the level of wetland functions being performed by the converted wetland.").

156.     The NWP 12 EA fails to evaluate the environmental justice implications of NWP 12 activities. Instead, the Corps summarily concludes that the NWPs as a whole "are not expected to have any discriminatory effect or disproportionate negative impact on any community or group." NWP 12 Decision Document at 143.

157.    Rather than evaluate the full impacts associated with oil and natural gas pipelines and other activities permitted by NWP 12, the NWP 12 EA appears to defer much of its analysis to the project level. For example, the EA states:

> District engineers will consider cumulative effects during their review of a PCN for a case-specific activity.
> . . .
> The district engineer's document explains whether the proposed NWP activity, after considering permit conditions such as mitigation requirements, will result in no more than minimal individual and cumulative adverse environmental effects. If the district engineer reviews a PCN and determines that the impacts of the jurisdictional activity are more than minimal, the district engineer will exercise discretionary authority to require an individual permit for that proposed activity.

NWP 12 Decision Document at 133–34. However, the Corps division or district engineer performs no further NEPA analysis when projects proceed under NWP 12, even upon issuance of verifications for specific projects.

158.    NEPA specifically requires an evaluation of "*any* reasonably foreseeable adverse environment effects which cannot be avoided should the proposal be implemented," 42 U.S.C.§ 4332(2)(C) (emphasis added), which cannot be accomplished if the Corps ignores the cumulative effects of its actions, particularly in the context of a nationwide permit that will be used thousands of times each year for major oil and gas pipeline projects across the country.

159.    Furthermore, NEPA requires the Corps to evaluate the cumulative effects of NWP 12 activities where, as here, a minimal cumulative effects determination is an essential precondition to the Corps' issuance of an NWP pursuant to the CWA. *See, e.g.*, 33 U.S.C. §1344(e)(1); 33 C.F.R. § 323.2(h); 33 C.F.R. § 320.4; 40 C.F.R. § 230.7(b).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**The Corps' reissuance of NWP 12 violated the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and applicable regulations**

160.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

161.    The Corps has a duty pursuant to ESA Section 7(a)(2) to ensure that its actions are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species critical habitat. 16 U.S.C. § 1536(a)(2).

162.    NWP 12 allows activities that result in direct harm to listed species from habitat loss and fragmentation, sedimentation and contamination of waters relied on by listed species, as well as indirect impacts associated with oil spills and climate change.

163.    The Corps' reissuance of NWP 12 is therefore an agency action that "may affect" listed species, and the Corps was required to undertake programmatic ESA Section 7 consultation to ensure that activities authorized and undertaken pursuant to the NWP 12 program will not jeopardize the continued existence of listed species or result in adverse modification of designated critical habitat. *Id*.

164.    The ESA requires that the Corps consider the collective, national-scale programmatic impacts of NWP 12 on listed species. Programmatic consultation is necessary to analyze the additive effects of NWP 12-authorized activities on listed species, in order to avoid piecemeal destruction of habitat that may jeopardize species in violation of ESA Section 7. In fact, when the Services issued the 2015 regulations defining framework programmatic consultations, they used the Corps' NWP program as a specific example of a federal program where programmatic consultation would be required. 80 Fed. Reg. at 26835.

165.    Programmatic Section 7 consultation on NWP 12 is necessary to afford the Services the opportunity to identify where NWP 12 may be problematic for listed species or critical habitat, and to provide reasonable and prudent measures to minimize take, such as measures to ensure that the Corps gathers and analyzes sufficient data to prevent jeopardy to listed species, and to ensure that incidental take does not occur at unsustainable levels.

166.    The Corps' reliance on future project-specific consultations to support its "no effect" determination for NWP 12 is inconsistent with the applicable regulations, which require programmatic review of NWP 12 as well as project-specific consultations. *See* 50 C.F.R. § 402.14(c) (project-specific consultation "does not relieve the federal agency of the requirements for considering the effects of the action as a whole"); 84 Fed. Reg. at 44997 (the ESA "still requires a programmatic consultation to meet the requirements of section 7(a)(2)[,]" even if "specific projects . . . developed in the future . . . are subject to site-specific stepped-down, or tiered consultations where incidental take is addressed").

167.    The Corps has not even ensured that project-specific consultation will occur for every NWP 12-authorized project that "may affect" listed species. The Corps relies on project proponents to submit a PCN where listed species "might be" affected so that the Corps can determine whether project-specific consultation is necessary. However, this impermissibly turns the initial effect determination over to non-federal applicants, whereas ESA Section 7(a)(2) requires federal agencies to make that determination. *See* 50 C.F.R. § 402.14(a).

168.    The Corps' reliance on permittees means that if those parties fail to notify the Corps for any reason, the agency will have no awareness that impacts to listed species were possible and thus no basis for consulting, in violation of the ESA.

169.     Regardless, the project-specific consultations contemplated by General Condition 18 cannot satisfy the Corps' ESA Section 7 duty to consult on the NWPs as a whole. Project-specific consultations cannot ensure that the aggregate impacts from the program will not jeopardize listed species or adversely modify critical habitat, and the Corps' NWP 12 scheme for ESA compliance therefore improperly curtails consultation on the NWP's full effects, in violation of the ESA. 50 C.F.R. § 402.14(c)(4) & (g)(3), (4).

170.     The Corps' failure to undertake and complete programmatic ESA Section 7 consultation with the Services on the issuance of NWP 12 constitutes a failure to ensure, as mandated by the ESA, that the NWP 12 program is not likely to jeopardize the existence of listed species or result in destruction or adverse modification of critical habitat, in violation of Section 7 of the ESA, 16 U.S.C. § 1536, and the ESA's implementing regulations. Such action is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law within the meaning of the APA. 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**

**The Corps' reissuance of NWP 12 violated the Clean Water Act, 33 U.S.C. § 1344(e), applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706**

171.     Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

172.     Section 404(e) of the CWA allows the Corps to issue NWPs only for categories of projects that the agency determines "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

173.     NWP 12 permits or authorizes the construction and operation of pipelines and associated facilities that do not result in the loss of greater than 1/2-acre of waters of the United

States "for each single and complete project." 90 Fed. Reg. at 26140. However, the Corps defines "single and complete linear project" as "that portion of the total linear project . . . that includes all crossings of a single water of the United States *(i.e., a single waterbody) at a specific location*." *Id*. at 26166 (emphasis added). The effect of this definition is to artificially treat each water crossing along a proposed pipeline project, which often number in the hundreds or thousands, as a "single and complete project" that qualifies separately under NWP 12.

174.    There is no limit to the number of times that a single pipeline project can use NWP 12, nor is there a total maximum number of acres of waters of the United States that a pipeline project can impact while still being authorized under NWP 12.

175.    NWP 12 relies on the arbitrary assumption that multiple water crossings along a pipeline are usually located on separate and distant waterways, such that the cumulative effects will be dissipated and therefore minimal. However, the Corps failed to respond to record evidence showing that is not the case, failed to define "separate and distant," and failed to require district engineers to make any "separate and distant" finding for NWP 12 projects.

176.    NWP 12 also relies on the discretion of division and district engineers to ensure, on a project-by-project basis, that the activities will have no more than minimal effects. However, this project-level review by Corps district or division engineers fails to ensure projects permitted by NWP 12 will have only minimal adverse environmental effects because for many projects that proceed under NWP 12, an applicant is not required to submit a PCN or notify the Corps at all, and thus the Corps does not have an opportunity to evaluate the adverse environmental effects of those projects.

177.    For those projects where a PCN is required, project-level review by Corps district or division engineers still fails to ensure that the multiple water crossings for projects permitted

by NWP 12 will have only minimal adverse environmental effects, either individually or cumulatively, because the practice of the Corps has been to issue verifications for specific water crossings without conducting a meaningful cumulative effect review. Plaintiffs' repeated comments to the Corps have set forth evidence showing that the project-level cumulative effects review does not always occur for pipelines; yet the Corps failed to meaningfully respond to those comments or make any changes.

178.    In short, NWP 12 permits pipeline projects to use the NWP numerous times along a pipeline or utility route—even if there are high concentrations of water crossings in specific areas—with no mechanism to ensure impacts would be minimal. Thus, the Corps failed to ensure that projects authorized by NWP 12 "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment" as required by 33 U.S.C. § 1344(e)(1) and Corps regulations. *See, e.g.,* 33 C.F.R. § 320.4; 40 C.F.R. § 230.7.

179.    For the reasons set forth above, the Corps' reissuance of NWP 12 was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and thus unlawful agency action under the APA. *See* 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF**

**The Corps' reissuance of NWP 12 violated the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h, applicable regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706**

180.    Plaintiffs reallege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

181.    The Corps' reissuance of NWP 12 was a major federal action that requires compliance with NEPA. *See* 42 U.S.C. § 4332(2)(C).

182.    The Corps issued an EA/FONSI for its reissuance of NWP 12, which constitutes the Corps' only NEPA document for an estimated 3,700 activities per year using NWP 12. The Corps will not prepare any further NEPA analysis for individual projects that are permitted or authorized by NWP 12.

183.    The Corps' EA violated NEPA by failing to take the requisite hard look at the significant environmental effects of reissuing NWP 12 (i.e., the impacts of projects permitted or authorized by NWP 12). Among other things, the NWP 12 EA failed to adequately analyze:

a.    The risks and impacts of gas leaks and crude oil spills from pipelines approved by NWP 12, including but not limited to spills into Corps jurisdictional waterways and an examination of the various types of crude oil products transported by NWP 12 projects and their respective properties, characteristics, environmental impacts, or spill response requirements;

b.    The environmental impacts associated with the construction and maintenance of pipeline rights-of-way, both within and outside of Corps jurisdictional waterways, including but not limited to the permanent conversion of forested wetlands to lower quality wetlands, forest fragmentation, habitat loss, erosion and sedimentation, soil nutrient loss, and aesthetic impairment;

c.    The risks and environmental impacts associated with frac-outs, or inadvertent returns, leaks, or spills of drilling fluids during installation of oil and gas pipelines using HDD;

d.    The cumulative impacts of NWP 12, including the effects of multiple uses of NWP 12 for the same pipeline within particular watersheds, regions, or other sensitive areas; and the impacts of other past, future, and reasonably foreseeable projects; and

184.     Absent an analysis of *all* the foreseeable environmental impacts of NWP 12—including cumulative impacts discussed herein—the Corps did not, and could not, take the hard look at NWP 12 that NEPA requires. Therefore, the Corps' failure to include an analysis of those impacts is arbitrary and capricious.

185.     The Corps' FONSI for NWP 12 was arbitrary and capricious, since the agency failed to make a non-arbitrary decision that the impacts of issuing NWP 12 are not significant. The environmental impacts associated with the Corps' reissuance of NWP 12 are "significant," *see* 33 C.F.R. § 333.20, and thus by preparing an EA/FONSI rather than an EIS for its NWP 12 reissuance, the Corps violated NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations.

186.     For the reasons set forth above, the Corps' reissuance of NWP 12 violated NEPA. It was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and thus unlawful agency action under the APA. *See* 5 U.S.C. § 706(2)(A).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a)    Declare the Corps' issuance of NWP 12 to be in violation of the ESA, CWA, NEPA, APA, and applicable regulations;

b)    Vacate NWP 12, in whole or in part, or, alternatively, set a date certain for completion of the ESA Section 7 consultation and NEPA review processes;

c)    Remand NWP 12 to the Corps for compliance with the ESA, CWA, NEPA, APA, and all applicable regulations;

d)    Award Plaintiffs their costs, expenses, and attorneys' fees under applicable law; and

e)    Provide for such other relief as the Court deems just and appropriate.

Dated: July 22, 2026    Respectfully submitted,


       */s/ Margaret E. Townsend*
       Margaret E. Townsend (D.C. Bar No. OR0008)
       Center for Biological Diversity
       P.O. Box 11374
       Portland, OR 97211-0374
       (971) 717-6409
       mtownsend@biologicaldiversity.org

       *Attorney for Plaintiffs Center for Biological Diversity and Friends of the Earth U.S.*

       */s/ Douglas Hayes*
       Douglas Hayes (Colorado Bar No. 39216)
       Sierra Club Environmental Law Program
       1650 38th Street, Suite 103W
       Boulder, CO 80301
       (303) 449-5595
       doug.hayes@sierraclub.org
       *Pro hac vice admission pending*

       *Attorney for Plaintiffs Sierra Club and Montana Environmental Information Center*

       */s/ Daniel E. Estrin*
       Daniel E. Estrin (D.C. Bar No. NY0729)
       Waterkeeper Alliance
       180 Maiden Ln, Suite 902
       New York, NY 10038
       (212) 747-0622
       destrin@waterkeeper.org

       *Attorney for Plaintiff Waterkeeper Alliance*